McGEE, Chief Judge.
This matter involves the alleged commission of indecent liberties against a child, C.C.[1] C.C.'s grandmother ("Grandmother") testified she and her mother took C.C. to Big Lots ("the store") around noon on 9 June 2014, to celebrate C.C.'s fourteenth birthday. Grandmother testified a man she later came to learn was Kelly Joe Vidovich ("Defendant") followed them into the store from the parking lot, and that Defendant was alone when he entered the store. Video entered into evidence showed the entrance of the store with Defendant entering the store alone as C.C., his Grandmother, and her mother were retrieving shopping carts. Defendant was wearing a "black T-shirt and gray shorts." Grandmother took her mother directly to the restroom in the rear of the store, where they remained for ten to fifteen minutes while C.C. waited just outside the door. C.C. noticed Defendant looking at him from the end of an aisle. Grandmother testified she and her mother exited the restroom, and along with C.C., "proceeded to ... walk ... down the aisles. [C.C.] went kind of his own little way at the time, looking at stuff." C.C. testified he went off on his own, and then he "noticed [Defendant] would follow me everywhere I went. And, so, I kinda ... got a little freaked out" and returned to tell Grandmother what was happening. C.C. explained: "I mean, you know, you got a guy that's, like, a lot bigger than you following you around the store everywhere you go, staring at you, like, constantly and, you know, watching you everywhere, so, you know, I kinda got a little freaked out."
Grandmother testified that after fifteen to twenty minutes of browsing, C.C. came up to her, appearing scared, and told her "there's a man here. He's following me and he's rubbing himself." Grandmother testified she walked with C.C. to investigate further and "we proceeded to walk up and down a few aisles, and every aisle we were, [Defendant] was there at the end of-he was in every aisle from then on." C.C. testified he was scared about walking around the store without his Grandmother right beside him, but he did so anyway. Grandmother testified Defendant "would just stand there and watch [C.C.] and just rub up and down on his private parts." C.C. testified he "noticed [Defendant] started rubbing [himself] while he was watching me." C.C. testified Defendant was looking directly at him while rubbing himself, and he described Defendant's look as "a creepy look. Like, he was looking directly at me, just staring me down[.]" C.C. further testified that "like, everywhere I went, [Defendant] would be right there, like in a matter of seconds."
The State had both Grandmother and C.C. stand in front of the jury and demonstrate what they had seen Defendant doing. They both demonstrated rubbing the "crotch area" up and down, or vertically. Grandmother testified Defendant "was rubbing like this very hard." She reiterated that Defendant was looking at C.C., while rubbing himself, with "just a pleasurable kind of look, like a-a sly look, like. You know, he was, like, trying to get his attention [.]" Grandmother testified that, as she and C.C. changed aisles, Defendant would follow and continued "rubbing his private parts every time he looked at" C.C., and that this continued along "five, six, seven, eight" different aisles. Grandmother testified Defendant was "rubbing," not "scratching" his "private parts," and that C.C. was "scared" and "very upset" by Defendant's behavior. When questioned about the possibility that Defendant was simply scratching himself, Grandmother answered that she knew the difference between a scratch and a rub, and "this was not a scratch." "It was a rub. It was a sexual rub." "I mean, it was quite obvious." On cross-examination, Grandmother agreed she saw Defendant "attempting to pleasure himself seven or eight times[.]" C.C. testified: "I cannot tell you how many times [Defendant] did do it, because it was so many. Probably, like [Grandmother] said, close to seven, eight times."
C.C. testified Defendant "would go up and then come to the front of the aisle, like a circle basically. And, you know, I was nervous. I didn't want to move 'cause, you know, if I went this way, he'd probably be right there or something like that." C.C. testified Defendant was "rubbing himself, you know, like the whole time he did the circle thing[,]" and Defendant was looking directly at C.C. with a "smirk" or "a stare-down kind of thing." C.C. further testified:
Well, you know, I could tell it wasn't him just, you know-like I-sometimes, you know, people have to pull their pants down or something, like not-like to get situated or whatever, but I could tell he wasn't doing that. I mean, the way he was following me, looking at me, and the way he was moving his-like had-like where he had his hands and what he was doing, I could tell, you know.
....
I mean, it was like-I don't know. It creeped me out. I mean, it was enough to, like, really scare me. Like my-it got me, like, all tore up. And, I mean, it's like he-it's like he-it was like-it's hard to explain. It's-it's like he had it out, but he didn't. Like, he was messing with it like it was out, kinda.
Grandmother then took C.C. to remain with her mother while Grandmother sought out a store manager. Grandmother approached a manager, Kimberly Harrison ("Harrison"), and told her about the situation. Harrison watched as C.C. began walking around the store again, and Defendant "proceeded up the aisles just following [C.C.]" again. Harrison testified that Defendant followed C.C., would stare "[s]traight at" C.C. with "just a complete stare" and "rub [himself] up and down" on his genital area with an "open-hand[.]" Harrison testified: "I was disgusted. I couldn't believe what I was actually witnessing." Harrison testified that Defendant was touching himself with an "open-hand" rubbing motion; he was not "scratching" himself. Harrison testified she witnessed Defendant rubbing his genital area two separate times, and each time lasted "[m]aybe a couple of minutes."
Grandmother testified she observed Harrison as Harrison was watching Defendant, and Harrison looked "very disgusted." At that time, Grandmother decided to call 911 and report Defendant, and the police dispatched two officers to investigate. Grandmother and Harrison testified that, at one point while all this was going on, they saw Defendant talking with a woman, later identified as Defendant's wife, Hiroko Mori ("Mori"), but Mori headed back toward the front of the store, bought Pringles, and left the store while Defendant went to the back of the store and continued following C.C.
At some point, C.C. realized he recognized Defendant, and told his Grandmother: "Hey, that's that guy that always hangs out close to my house and walks by all the time." C.C. said Defendant spent a lot of time at a nearby neighbor's house. Defendant also later testified he recognized C.C. from "the neighborhood of a house I frequented[.]"
Both Grandmother and Harrison testified Harrison went to find a male manager, James Ryan Neas ("Neas"), to show him what Defendant was doing. Neas testified that, after he was alerted to Defendant's behavior, he followed Defendant from a distance to observe for himself. Neas testified:
And every location that [C.C.] would go, [Defendant] would follow. I did not see any rubbing of the pants, but I did see literally every location that [C.C.] would go from, point A to point B, [Defendant] would follow. And it was pretty blatantly obvious that he was following [C.C.] here.
Grandmother testified before the police arrived, Defendant "went down the aisle toward the [restrooms]. "He bent over to the water fountain and got a drink, leaned his hand up against the wall, proceeded to rub himself, looking at [C.C.], and then went into the bathroom." C.C. testified that Defendant "went to the water fountain. And as he was drinking water, I noticed him looking at me." C.C. stated that
whenever [Defendant] was leaning down to get a drink of water, he was like this, and he was looking directly at me. And whenever he got up, I saw him go over against the wall like this and start rubbing himself real hard right here, and leaned against the wall like this, and then he went into the [restroom].
C.C. was frightened, wondering "if he's trying to get me in that [restroom], I mean, that's-I was-at that time I was, like, that's crazy."
C.C. testified that, once Defendant left the restroom, Defendant began following him again, and Neas continued watching Defendant. C.C. stated that Defendant "made his way back into the bathroom." Neas went into the bathroom to see what Defendant was doing, but left after seeing that Defendant was in a locked stall. According to Neas, once Defendant left the bathroom, he went "straight back to following [C.C.]"
Defendant testified he went into the store to use the restroom and then wandered around looking for deals, although he did not have a shopping cart or basket. Defendant stated that, at some point, he noticed C.C. staring at him, then later noticed C.C. and two other people following him around the store. Defendant testified he was in the store about thirty-five minutes. The timestamp on the video from the store shows Defendant entering at 12:08 p.m. and leaving at 12:53 p.m., indicating he was in the store for forty-five minutes.
Two police officers ("the officers") from the Asheboro Police Department arrived at the store, including Officer Troy Gable Vincent ("Officer Vincent"), and Grandmother told the officers what had been happening. The officers went up to Defendant and spoke with him, and Grandmother heard Defendant telling the officers that he was just looking for his wife. Both Neas and Officer Vincent testified they could smell the odor of alcohol emanating from Defendant. Mori returned and joined Defendant as he was being questioned by the officers. Officer Vincent testified that Defendant told him he had a "rash" and that was why he was rubbing himself, and that he had seen a doctor for the rash. Mori also told Officer Vincent that Defendant had a rash, and testified that the rash was not on his penis, but "around it." When Officer Vincent advised Mori what they were questioning Defendant about, she "appeared" as though she "may have been upset because as soon as [Officer Vincent] explained what we were doing, she abruptly turned around and ... left[.]"
Defendant testified that he believed he got the rash when he was chopping wood, touched some poison ivy, then touched his penis while urinating outside. He further testified that, because he was working hard and sweating, his groin area got chaffed, as well. However, Defendant said he wasn't rubbing his penis in the store, he was rubbing beside it. Defendant clarified that he did not have a rash on his penis, only around it. Defendant agreed that he was rubbing, not scratching, but only around his penis.
Officer Vincent spoke with Harrison briefly, but he "didn't take her ... aside and take a detailed statement about what happened[.]" Officer Vincent testified he overheard Harrison telling someone she saw Defendant rubbing himself twice. Officer Vincent spoke with Neas "for quite a while." C.C. testified that the police officers questioned him only briefly. Officer Vincent testified he had no recollection of any witness telling him that Defendant was "scratching" himself, only that he was "rubbing" himself. Officer Vincent did not try and verify that Defendant had a rash by either asking Defendant to show him, or asking for any confirmation from Defendant's doctor.
Officer Vincent testified he was not particularly knowledgeable about child sex crimes law because that was not a regular part of his job, so he called a detective who handles child sex crimes and discussed the matter with the detective. After talking with the detective, Officer Vincent asked Grandmother and C.C. if Defendant had exposed himself; they told Officer Vincent that Defendant had not. The officers then, at the request of Neas and Harrison, "trespassed" Defendant and escorted Defendant out of the store. After Defendant had been escorted from the store, Officer Vincent informed Grandmother that he did not believe he could bring criminal charges against Defendant because Defendant had not exposed himself. Officer Vincent testified that Grandmother became: "I would say hysterical." She was "mad and angry, upset." Grandmother told Officer Vincent that "[Defendant] walks up and down the street in front of my grandson's house, urinates out in the open, and frequents a house that's nearby." Officer Vincent asked Grandmother where she lived, and she told him she lived out in the county. Before the officers left, they handed Grandmother a card for the Randolph County Sheriff's Office, so that she could call and ask if the sheriff's office was willing to investigate.
C.C., Grandmother, and her mother left the store. They then went to a different store, but C.C. "was terrified that [Defendant] was gonna come in that store. He was really scared about that" and just wanted to go home. C.C.'s mother testified in a corroborative capacity, and stated that Grandmother told her Defendant had followed C.C. around the store and rubbed his genital area in an "up and down" motion. She also testified she had seen Defendant in her neighborhood prior to the incident in the store, and that C.C. would no longer stay at her house alone, so he spent a lot of time with Grandmother over the summer. C.C. testified: "I was kinda scared the whole summer. I stayed with [G]randmother. I didn't stay at home or nothing." Grandmother testified that C.C. "would not stay home alone" because he was "scared that [Defendant] was gonna come around[.]" Because it was the beginning of summer break, C.C. "spent the whole summer with" Grandmother instead of at his own home.
Grandmother called the Randolph County Sheriff's Office either the night of the incident or the next day, and discussed the matter with Detective Jason Hunter ("Detective Hunter"). Detective Hunter spoke with C.C. about the incident as well. Following his investigation, Detective Hunter obtained an arrest warrant for Defendant on 18 June 2014, based upon a charge of taking indecent liberties with a child. Defendant was indicted on 1 December 2014 on one count of taking indecent liberties with a child. Defendant was tried beginning 15 December 2015, and was found guilty on 17 December 2015. Defendant was convicted at a prior record level II, and sentenced to fifteen to twenty-seven months' imprisonment. Defendant appeals.
In Defendant's first argument, he contends the trial court erred in denying his motion to dismiss the charge because the State failed to present sufficient evidence that "the purpose of [Defendant's] conduct was sexual arousal or gratification." We disagree.
Our standard of review for the denial of Defendant's motion to dismiss is as follows:
"This Court reviews the trial court's denial of a motion to dismiss de novo. "
" 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' "
"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
"In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor."
State v. Marley , 227 N.C. App. 613, 614-15, 742 S.E.2d 634, 635-36 (2013) (citations omitted).
Defendant argues that, "even in the light most favorable to the State, the evidence that [Defendant] rubbed the outside of his pants in the crotch area while looking at or following [C.C.], is insufficient to show that [Defendant]' s conduct was for the purpose of arousing or gratifying sexual desire as required by ... statute." Relevant to the present case:
(a) A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he either:
(1) Willfully takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire[.]
N.C. Gen. Stat. § 14-202.1(a)(1) (2015). In explaining this statute, our Supreme Court has stated that
"[t]he evil the legislature sought to prevent in this context was the defendant's performance of any immoral, improper, or indecent act in the presence of a child 'for the purpose of arousing or gratifying sexual desire.' Defendant's purpose for committing such act is the gravamen of this offense; the particular act performed is immaterial. It is important to note that the statute does not contain any language requiring a showing of intent to commit an unnatural sexual act. Nor is there any requirement that the State prove that a touching occurred. Rather, the State need only prove the taking of any of the described liberties for the purpose of arousing or gratifying sexual desire."
State v. Shue , 163 N.C. App. 58, 61, 592 S.E.2d 233, 235-36 (2004) (quoting State v. Hartness , 326 N.C. 561, 567, 391 S.E.2d 177, 180-81 (1990) ). "[P]roof of intent is often shown by the circumstances[.]" Shue , 163 N.C. App. at 62, 592 S.E.2d at 236.
The evidence in the present case, taken in the light most favorable to the State, is as follows: For over thirty minutes Defendant followed C.C. around the store, continually staring at him, and masturbating through his shorts. More specifically, four witnesses testified Defendant was clearly following C.C. around the store and staring at him, in an intentional and inappropriate manner. Three witnesses testified Defendant was rubbing the area of his shorts where his penis was, with an open hand, in an up and down manner, many times, as Defendant followed C.C. and stared at him. Defendant was twice seen going into the restroom after following C.C. around the store and rubbing his penis, even though Defendant testified he had already urinated upon initially entering the store.
Defendant testified that he had a rash, and that was why he was rubbing around his penis. Defendant stated that he received the rash after he touched poison ivy with his hands, then immediately touched himself while urinating outside. However, there was no evidence presented that Defendant had poison ivy on his hands, and both Defendant and Mori testified there was no rash on Defendant's penis, only on areas surrounding his penis. This evidence could have undercut Defendant's credibility with the jury concerning the reason he was rubbing his genital area.
The evidence presented at trial was sufficient for the jury to infer that Defendant was following C.C. and staring at him, and that Defendant was stimulating his penis, all for the purpose of arousing or gratifying sexual desire and was, therefore, enough to survive Defendant's motion to dismiss. The fact that Defendant offered evidence that his actions were not for the purpose of arousing or gratifying sexual desire was not sufficient to require dismissal, as the trial court must resolve any contradictions in the evidence in favor of the State. Marley , 227 N.C. App. at 615, 742 S.E.2d at 636. This argument is without merit.
In Defendant's second argument, he contends that " N.C. Gen. Stat. § 14-202.1(a)(1) is unconstitutionally vague as applied to [him] because he could not have known that his conduct fell within the scope of the statute[.]" We disagree.
As Defendant acknowledges, Defendant failed to make this argument to the trial court and has, therefore, abandoned it. State v. Golphin , 352 N.C. 364, 411, 533 S.E.2d 168, 202 (2000) ("Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal.") (citation omitted). Defendant has abandoned this argument for appellate review.
In addition, Defendant's argument has already been considered and rejected by our appellate courts:
[d]efendant's first contention is that the prosecution should have been dismissed before trial, pursuant to his motion, because G.S. 14-202.1, which prohibits taking indecent liberties with children, is unconstitutionally vague and overbroad. This same contention was squarely rejected by our Supreme Court in State v. Elam , 302 N.C. 157, 273 S.E.2d 661 (1981).
State v. Strickland , 77 N.C. App. 454, 455, 335 S.E.2d 74, 75 (1985). Assuming arguendo we were to consider Defendant's contention that his particular behavior is distinguishable from the behaviors underlying the holdings in Elam and Strickland , we simply state that Defendant should have known that following a child around a store and continually staring at that child while masturbating, even if the touching was through Defendant's clothing, was conduct prohibited by law. Kolender v. Lawson , 461 U.S. 352, 357, 75 L.Ed. 2d 903, 909 (1983) ("the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement") (emphasis added) (citations omitted).
NO ERROR.
Report per Rule 30(e).
Judges McCULLOUGH and DAVIS concur.
Judge McCullough concurred in this opinion prior to 24 April 2017.

We use initials to protect the child's identity.